**HUDSON RIVERKEEPER FUND, INC., Plaintiff,**

v.

**ORANGE AND ROCKLAND UTILITIES, INC., Defendant.**

**No. 93 Civ. 3116(CLB).**

United States District Court, S.D. New York.

Oct. 21, 1993.

Robert F. Kennedy, Jr., Natural Resources Defense Council, Inc., Steven P. Solow, Tom Humbach, Elizabeth Pober, legal intern, Pace Environmental Litigation Clinic, Inc., White Plains, NY, Theresa Rose Hanczor, Hudson Riverkeeper Fund, Inc., Garrison, NY, for plaintiff.

G.S. Peter Bergen, Leboeuf, Lamb, Leiby & Mac Rae, New York, NY, for defendant.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Defendant Orange & Rockland Utilities, Inc. ("O & R"), seeks summary judgment dismissing the Amended Complaint ("Complaint") in this action for lack of subject matter jurisdiction; failure to state a claim upon which relief may be granted; and failure to join the New York State Department of Environmental Conservation ("DEC") as issuer of a State Pollutant Discharge Elimination System ("SPDES") permit held by defendant, as a necessary party to this action.

### Parties

Plaintiff, Hudson Riverkeeper Fund, Inc., ("Riverkeeper") is a New York not-for-profit corporation. Its purpose is to preserve and protect the beauty, quality and biological integrity of the Hudson River and its tributaries, primarily by litigation. Most of its 1,250 members live along the Hudson or its tributaries and use the Hudson River and its watershed for such activities as commercial and recreational fishing, boating, bird watching and hiking. They share a common concern about the quality of the Hudson and its watershed. Riverkeeper has been held to have standing as a citizen to enforce the Clean Water Act, and to sue for claimed violations of SPDES permits issued by DEC affecting the Hudson River. *See Orange Environment, Inc. v. County of Orange,* 811 F.Supp. 926 (S.D.N.Y.1993), and 33 U.S.C. § 1365(a).

Defendant O & R, a New York corporation, is a franchised, regulated public utility engaged in the generation and distribution of electric power. As such, O & R owns and operates as one of its sources of electric power, the Lovett Generating Station ("Lovett") located on the west shore of the Hudson River at Tompkins Cove, Rockland County, New York, in this district.

Lovett uses four separate intake structures for Hudson River water to cool the steam condensers into which the turbines are exhausted. Once used, the water is discharged into the river together with the waste heat, at three separate points of discharge. Both the intake structure and the discharge are operated pursuant to an SPDES renewal permit issued effective October 1, 1991, hereinafter "the permit" or the "SPDES permit".

### The Complaint

Plaintiff seeks declaratory judgment, injunctive relief and monetary damages pursuant to § 309(d) of the CWA, 33 U.S.C. § 1319, based on allegations that defendant O & R is engaged in continuing violation of Condition 9 of the SPDES permit for the Lovett plant. Condition 9, its meaning and effect will be discussed below.

### Factual Background

The following facts are well pleaded and assumed to be true for the purpose of the motion. Defendant O & R's Lovett facility consists of five fossil fuel fired steam turbine electric generating units, numbered one through five. Unit 1 built in 1949 and 2 built in 1950, are standby units which operate when required. Unit 3, built in 1955, operated in 1992 at 11% of its average annual capacity. In 1992, Unit 4, built in 1966 and Unit 5, built in 1969, operated at 54% and 48% of capacity respectively. It does not appear whether these low percentage operating levels were caused by maintenance shutdowns, lack of demand, operating decisions related to fuel, efficiency, costs, or other reasons.

The location and configuration of the water intakes and discharges from and into the Hudson River are shown on Exhibit "B", page 2, to the affidavit of Robert T. Kosior sworn to July 2, 1993, attached to the defendant's Notice of Motion (Doc. 14), hereinafter "Kosior Affidavit".

The principal concerns of the plaintiff and the DEC with regard to this facility involve (1) injury to fish which are impinged on the vertical traveling ⅜ inch screens behind the entrance of each intake, discussed below, (2) death by entrainment of fish smaller than ⅜ inch in size, and other fish and plant life, which pass through the screens and are, with minor exceptions, killed by the turbulence and the heat encountered in passing through the heat exchangers, or condensers, and (3) the adverse effect on the River of the waste

heat energy discharged as a result of the process.

A typical Lovett intake structure, with pump and screen, is depicted on Exhibit "B", page 1, of the Kosior Affidavit. So called "trash racks", consisting of steel vertical bars, are placed at the entrance of each intake to prevent large debris, boats, people, large fish and other marine life from entering a pumping chamber or three sided tank. Behind the trash racks, are ⅜ inch mesh so called "vertical traveling screens". These rotate upwardly in the intake chamber, in the manner of a conveyor belt, ahead of the centrifugal intake pump, to prevent debris, fish and other marine life larger than ⅜ inch from entering the intake pump which services the condensers. Objects smaller than ⅜ inch pass through the intake. Entrainment is said to occur when aquatic life measuring less than ⅜ inch is drawn through the vertical traveling screens, passes into the cooling water intake unit and is heated in the condenser and discharged with the heated water back to the River. Impingement of aquatic life larger than ⅜ inch is said to occur when it is drawn into the unit, compressed against the vertical screen, and thereafter washed off the screen with water jets, into the screen wash trough, which returns it to the River.[1]

On May 30, 1989, O & R applied to DEC to renew its SPDES permit for the Lovett facility which would expire in December 1989. After the usual procedures involving public notice, the DEC issued a renewal permit to O & R covering the operations described above, together with other discharges by O & R at the Lovett plant not relevant to this case. The renewal permit, which became effective October 1, 1991, and expires October 1, 1996, is Exhibit "A" of the Kosior Affidavit.

Riverkeeper had written to Mr. Edward W. Radle, Supervising Aquatic Biologist, the DEC officer in charge of the drafting of the permit (the "Permit Writer") expressing its views, discussed below.

Familiarity on the part of the reader with the entire permit is assumed. We summa-rize the permit only to the extent deemed necessary. The SPDES permit grants a single authorization (No. 003) for Units 1, 2 and 3; another authorization, (No. 004) for Unit 4, and one for Unit 5 (No. 019). Each of these call for a maximum temperature at discharge of 107°F, and a maximum difference between intake and discharge of 22.5°F in summer, and 28.5°F in winter. The permit provides for a maximum of 161.0 million gallons per day for Units 1, 2 and 3, 150.2 million gallons per day for Unit 4, and 172.8 million gallons per day for Unit 5; making a total maximum discharge under the SPDES of 484.0 million gallons per day. While the permit does not limit the number of days of operation, in practice far less water is actually pumped under the permit than could be pumped if the plant operated at 100% average annual capacity.

The SPDES permit, commencing at page 11, contains a list entitled "Additional Requirements". There are fourteen such separate requirements or Conditions. Some do not relate to the cooling water, or merely require specialized bookkeeping; e.g. Condition 5b, which requires that daily water use shall be measured and logged for the outfalls on the condenser cooling, and that temperature of the intake and discharges must be recorded continuously. Condition 8 contains a specific requirement for a report to be submitted for October 1993, "on the economic and engineering possibilities for reducing the quantities of waste heat rejected[sic] to the Hudson River and of condenser cooling water used". This condition also provides that "reduction in the use of cooling water shall be considered both as a result of decreased need due to beneficial use of turbine exhaust steam, and as an independent method of reducing entrainment and impingement" [of marine life].

Condition 9, upon which this litigation is founded, is a new provision which was not found in the permit being renewed. It had been proposed by the Permit Writer for the DEC and opposed by O & R. Riverkeeper also opposed Condition 9, arguing essentially

---

1. Entrainment is almost uniformly fatal to fish, fish eggs, aquatic plants and other organisms. Impingement kills some fish, but not all.

that it was too vague to be enforceable, and therefore would not protect the marine life in the river. Condition 9 reads in full as follows:

> 9. The location, design, construction, and capacity of the cooling water intake structure shall reflect the *best technology available* for minimizing adverse environmental impact. (Emphasis added)

Condition 10 requires the permittee to submit at least 60 days in advance notification of any change proposed in the location, design, construction, operation or capacity of the cooling water intake structure with, "a demonstration that the change reflects the best technology currently available for minimizing adverse environmental impact". Condition 10 also provides that, "prior DEC approval is required before initiating such change". Condition 11 requires a report of information concerning impingement, and Condition 12 requires a sampling program to determine "the abundance and species composition of fish and invertebrates impinged on the intake traveling screens". Condition 13 provides that if more than 100,000 fish per year for any two consecutive years should be impinged at Lovett, a detailed technology review and recommendations to mitigate impingement would be required. Condition 13c also provides for specific modification of the screen wash water discharge sluices, "so that hazards to the viable fish in the screen wash water sluices have been minimized". Condition 14 provided for an entrainment monitoring program with sampling.

On October 20, 1989, initiating the drafting of the renewal permit, the Permit Writer wrote to O & R enclosing a proposed draft of biological monitoring/mitigation conditions for inclusion in the SPDES renewal permit. Among these draft conditions was what later became Condition 9.

Defendant asserts that Mr. Kosior, Manager of the Environmental Services Department of O & R, and by inference, the Permit Writer:

> "[knew] at that time there was no generally applicable definition of "best technology available" established by DEC, that the definition would vary from plant to plant on a case-by-case basis, and that various

technologies were then available or under study."

Kosior Affidavit p. 10, July 2, 1993.

After additional drafts and meetings with O & R discussing the terms of the permit, DEC issued a draft permit and ordered O & R to publish notice of the proposals subject to public comment. Riverkeeper submitted responsive comments to DEC dated March 23, 1990. (Exhibit "E4" attached to Doc. 17 in this case). Riverkeeper directed its comments first to the magnitude of the thermal discharges, contending that consideration should be given to the effect of two other electric generating stations in the Haverstraw Bay area not owned or operated by O & R. It urged that "the cumulative impacts of these thermal discharges must be addressed" in considering the permit to be issued to O & R. Riverkeeper also argued that the provisions of the permit relating to impingement and entrainment were "too lenient" and "unenforceable". Riverkeeper also noted that:

> "Eighteen years have passed since the 1972 CWA required intake structures to reflect the Best Technology Available (BTA) for minimizing adverse environmental impact, yet, there is no standard or criteria governing this requirement in the permit."

Riverkeeper then asserted that the concerns expressed in its letter are "of sufficient significance to require a hearing on this matter should the Department decide not to incorporate these recommendations into O & R's Lovett permit or should the Department fail to require a study on the cumulative effects of the thermal discharges."

The response of DEC is found as Exhibit "E5" to Doc. 17, and is dated August 23, 1991. DEC took the position that the objections of Riverkeeper "do not provide sufficient evidence of the contravention of regulatory standards requiring a hearing, nor do they provide a sufficient basis for introducing new permit conditions into the permit at this time". DEC declined to hold a public hearing and enclosed a copy of the permit issued the same date. DEC did not address the argument made by Riverkeeper that there

was no standard or criteria governing the requirement for Best Technology Available.

Summary Judgment shall be granted "if the [papers] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The movant "always bears the initial responsibility of informing the district court of the basis of its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). All factual inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). However, an opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. In order to defeat a summary judgment motion, the nonmoving party "need only present evidence from which a jury might return a verdict in [its] favor." *Anderson* at 257, 106 S.Ct. at 2514.

Our Court of Appeals has held that "a court's ultimate role in considering a motion for summary judgment is not to resolve disputed issues, but only to determine whether there is a genuine and material issue for trial." *Hudson Hotels Corp. v. Choice Hotels International, Inc.*, 995 F.2d 1173, 1175 (2d Cir.1993); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986).

For reasons set forth below, this Court concludes that it is a genuinely disputed issue of material fact whether the Lovett plant is presently in compliance with Condition 9 of its SPDES permit, and that the Condition is valid and enforceable by citizen suit.

*Discussion*

This Court has subject matter jurisdiction over a complaint filed, as is this action, pursuant to § 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1). This subject matter jurisdiction is granted to the court pursuant to 28 U.S.C. § 1331. Defendant argues (Brief, page 15) that Riverkeeper's claim is "actually a collateral attack on the terms of the permit, not an enforcement claim". O & R's argument seems to imply, in effect, that Condition 9 is a nullity, and that by the issuance of the permit DEC has made a final determination that the existing intake structures modified in accordance with Condition 13c will reflect the Best Technology Available, and that the permit terms may not be amplified or modified in this or any lawsuit, but merely enforced. Based on legislative history, the defendant argues that this is not truly an enforcement action, but merely an attempt to have this Court develop its own definition of Best Technology Available after DEC, by issuing the permit, has already determined the matter.

This argument is at most an argument that the complaint fails to state a claim and is not a valid attack on subject matter jurisdiction. We take our subject matter jurisdiction from the face of the complaint. As the Supreme Court taught in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946),

> "Before deciding that there is no jurisdiction, the district court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States. For to that extent 'the party who brings a suit is master to decide what law he will rely upon and ... does determine whether he will bring a 'suit arising under' the ... [Constitution or laws] of the United States by his [complaint]'. *The Fair v. Kohler Die Company*, 228 U.S. 22, 25 [33 S.Ct. 410, 411, 57 L.Ed. 716]

> \*     \*     \*     \*     \*     \*

> The reason for this is that the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief, as well as to determine issues of fact arising in the controversy".

> \*     \*     \*     \*     \*     \*

For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."

Just as in *Bell v. Hood, supra,* the papers submitted in support of this motion do not show that the claim is insubstantial or frivolous. The complaint does, in fact, raise serious questions both of law and fact, which this Court can decide only after it has assumed subject matter jurisdiction over the controversy.

We have noted earlier that Riverkeeper, or at least its members, are "citizens" within the meaning of § 505(g) of the Act, 33 U.S.C. § 1365(g). The statutory notice of violation and the intent to file suit have been provided, and neither the Environmental Protection Agency (EPA) nor the DEC has elected to prosecute any enforcement action.

This Court concludes that Riverkeeper is not estopped from taking its present litigation position, because it criticized the form, content or scope of Condition 9 during the permit drafting procedures of the DEC, or because it argued to the DEC that Condition 9 was unenforceable as a matter of law for want of published standards of criteria. DEC rejected this argument, which is primarily an issue of law or statutory construction. Equity does not require that Riverkeeper be compelled to adhere to its original legal opinion under the circumstances present here.

█ This Court concludes as a matter of law that Condition 9 is not so vague or ambiguous as to be useless, lacking in meaning, or unenforceable. Best Technology Available, under the statute, is something which exists, and can be ascertained as fact.

█ Plaintiff has submitted the affidavit of Dr. Ian Fletcher, which avers in some detail that the intakes at the Lovett plant do not utilize the Best Technology Available. Riverkeeper essentially contends that the Best Technology Available would be closed cycle cooling, and apparently suggests if this argument is not acceptable, evidence of the Best Technology Available would be found from examination of permits for similar once-through cooling intake facilities maintained by others, including the Indian Point Plant utilizing the so called Fletcher/Ristroph Screens.

Riverkeeper's position and the essence of this lawsuit is its contention, disputed by O & R, that the Lovett plant does not utilize the Best Technology Available, that Best Technology Available is a word of art in the statute, which may be adjudicated as a fact in this action and in respect of this facility, that Condition 9 of the SPDES permit is not so ambiguous as to be unenforceable, and that failure to comply with Condition 9 may be the subject of a citizen suit under the Clean Water Act. Section 301(b) of the Clean Water Act does appear to use the term "best technology available for minimizing adverse environmental impact" as a word of art. Some years ago, the Environmental Protection Agency attempted to promulgate national standards for technological criteria applicable generally to cooling water intake structures, based upon its finding of the Best Technology Available. In 1976 these regulations were challenged because of the procedural manner in which they had been adopted and published, and in *Appalachian Power Co. v. Train,* 566 F.2d 451 (4th Cir. 1977), the regulations were declared ineffective because of failure to comply with publication requirements of the Administrative Procedure Act as to incorporation by reference. The Court of Appeals in *Train* held, "the Agency [EPA] on remand may take further action with respect to the regulations should it be so advised." Although *Train* did not relate to the substance of the regulations, in true bureaucratic form, the agency took no action to republish and in effect abandoned or withdrew its regulations in 1979. Since that date, EPA has issued no regulations for § 316(b) of the Clean Water Act, although space has been reserved in the C.F.R. This leaves to the Permit Writer an opportunity to impose conditions on a case by case basis, consistent with the statute, and a view that best available doesn't mean perfect. *See generally E.I. DuPont de Nemours & Co. v. Train,* 430 U.S. 112, 121, 97 S.Ct. 965, 971, 51 L.Ed.2d 204 (1976). *See National Resources Defense Council v. EPA,* 822 F.2d 104 (D.C.Cir.1987).

This case is somewhat unusual in that the Permit Writer apparently chose to insert as a condition of the SPDES permit, a paraphrase of § 704.5 of the DEC's own regulations. So long as this concept remained only in the regulations it was not a basis for a citizen suit. This is so because the relevant statutory authority for a citizen suit, 33 U.S.C. § 1365(a)(1) extends only to an allegation of violation of (A) an effluent standard or limitation or (b) an order issued by the Administrator or a State with respect to such a standard or limitation. There is no authority for a citizen suit beyond the enforcement of existing effluent standards or limitations established administratively under the Act, i.e. by provisions of an SPDES permit. *United States v. Hooker Chemicals & Plastics,* 749 F.2d 968, 979 (2d Cir.1984). This rule of law is deemed known to the DEC. By inserting the same requirement found in Reg. § 704.5, as Condition 9 in the permit, the Permit Writer in effect issued an open invitation to a lawsuit, which invitation Riverkeeper accepted. The presence of Condition 9 in the Lovett SPDES permit allows plaintiff to allege that the permit is being violated because the facility is not employing the Best Technology Available.

O & R asserts, in support of its motion, (Kosior aff. ¶ 18) that the Permit Writer informed O & R orally that this proposed paragraph "was intended to make clear that DEC had authority to regulate intake structures". Assuming it was said, this statement was and is absurd. The authority of DEC is clear under the statute and regulations, and gains nothing by the addition of wording in the permit. There was certainly no purpose in "making clear" anything at all to this sophisticated permittee fully advised by counsel and by its own engineers. In any event, to the extent that this unrecorded oral statement of position by the Permit Writer may have been stated orally to the permittee, it is irrelevant. Condition 9 must be assumed to have been made a part of the SPDES permit for some purpose, and not merely to impart the obvious, as now contended by O & R, that DEC had continuing jurisdiction. Were it deemed necessary to assert this obvious point, it could have been done in plain English simply by so stating.

The SPDES permit must be read as a whole, in accordance with its plain meaning, and the Permit Writer's subjective intention as to its meaning is of no importance. The permit language, by Condition 9, makes it clear that Best Technology Available must be employed and to ascertain whether or not this is being done it is not necessary to review legislative proceedings or congressional intent. When the language of a statute is clear, its plain meaning ordinarily controls its construction, and the same is true of conditions in permits. *See National Foods, Inc. v. Rubin,* 936 F.2d 656 (2d Cir.1991). Once the permit was issued it had the force of law, and citizens desiring to sue, including Riverkeeper, could rely on the plain meaning of Condition 9. O & R had no right to rely on any oral statement contrary to the plain meaning.

As we noted earlier, to resolve this motion it is not necessary to ascertain what is the Best Technology Available for the Lovett facility, nor need the Court enumerate at this time all the various factors which would affect that issue of fact, including matters such as cost, the age of the facility, the number of fish killed, the additional energy, if any, needed to support improved technology, or other relevant concepts. *See* 33 U.S.C. § 1314(b)(1)(B); *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 639, 642 (2d Cir.1976).

Plaintiff suggests in its complaint that there are better technologies available, which would minimize significantly fish impingement and entrainment at Lovett. Included in this technology are the use of Fletcher/Ristroph Screens and volume restrictions. Riverkeeper claims that some or all of this better technology is in current use in nearby Hudson River electric generating plants operated by others. Facially, it is hard, but not impossible, to justify the issuance of permits to plants existing within view of one another, operating on the same part of the River, with technologies for fish protection which are so markedly different.

Counsel for O & R, G.S. Peter Bergen, asserts in his September 17, 1993 affidavit, that the Best Technology Available has al-

ready been determined for Lovett by DEC. If this is so, then as noted earlier, Condition 9 must be regarded as surplusage and the Court is unwilling to conclude, short of a trial of the merits, that the DEC would attach a condition to a SPDES permit which was pure surplusage, redundant, or otherwise useless. He asserts that the present vertical traveling screens and wash systems are "highly effective fish saving devices". This may be true, but it appears to be a genuinely controverted material fact, which certainly cannot be resolved by affidavits, short of a plenary trial of the merits. He also noted that the impingement is far below the maximum authorized in Condition 13a. This may well be true, but may relate more to the fortuitous degree of non-use, or the extent that the plant is not operated. As we noted earlier, Unit 4, the most active of the units, was operated for only 54% of the time in 1992. While many complex factors apart from the death rate of fish, affect the issue of Best Technology Available, this Court concludes that they are justiciable, and that Condition 9 is a condition of the SPDES permit which may be enforced by injunctive relief.

*DEC as a Necessary Party*

As an additional ground for summary judgment in its favor, O & R argues that the case should be dismissed because the DEC has not been named as a necessary party. Riverkeeper opposes and asserts DEC is not a necessary party, arguing essentially that whether or not O & R is in violation of Condition 9 of its permit is a matter of fact which does not require agency expertise, and that DEC has not been joined in most similar litigation in this Circuit.

The Court concludes that under the plain language of Rule 19(a)(2)(ii) F.R.Civ.P., DEC is a necessary party to this action because failure to join it as a party would leave O & R subject to "a substantial risk of incurring double, multiple or otherwise inconsistent obligations...." According to Condition 10 of the SPDES permit, no structural changes to the intakes can be made without approval of the DEC. Should injunctive relief issue to perform some modification on the intakes, however slight, such an injunction enforcing Condition 9 might cause O & R to be in violation of Condition 10. Furthermore, the DEC remains a source of information available for the assistance of the parties and this Court in order to determine what the Best Technology Available is, and should improvement be required, how, and over what time period, a court of equity should enforce Condition 9 consistent with all other all other Conditions of the permit which affect the public interest.

Unless the DEC decides to intervene in the action within twenty days of the date of this Decision, or such longer period as it may reasonably request of the Court to consider intervention, an amended complaint should be filed naming the DEC as a defendant. If plaintiff fails or refuses to do so, the Court will dismiss the action without prejudice.

The motion is denied for the reasons stated above. Counsel for the parties should confer with a view towards preparing a Case Management Plan, (Form D). A status conference shall be held before me on December 14, 1993 at 9:00 A.M. in Courtroom 31 at the White Plains Courthouse.

SO ORDERED.