**SIERRA CLUB, Plaintiff,**

v.

**YOUNG LIFE CAMPAIGN, INC., Defendant.**

**No. CIV.A. 00–K–1820.**

United States District Court, D. Colorado.

Oct. 29, 2001.

John M. Barth, Hygiene, CO, for plaintiff.

Daniel J. Dunn, Brent Allen Tracy, Holme Roberts & Owen LLP, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

In this citizen environmental suit Plaintiff Sierra Club alleges Defendant Young Life Campaign, Inc. ("Young Life") has violated and continues to violate its National Pollution Discharge Elimination ("NPDES") permit and the Federal Water Pollution Control Act, otherwise known as the Clean Water Act, 33 U.S.C. §§ 1251–1387, by failing to measure and record the stream flow in Crooked Creek on a continuous basis. Young Life moves to dismiss on various grounds, or, in the alternative, to require the Sierra Club to make a more definite statement and/or to strike certain statements in the complaint. For the reasons stated below, I deny Young Life's motion.

## I. Background

Young Life owns and operates the Crooked Creek Ranch, a 960–acre lodge and recreational facility, near Fraser, Colorado. Before beginning operations in 1999, Young Life applied to the Water Quality Division of the Colorado Department of Public Health and the Environment ("CDPHE" or "State") for a site permit to build and operate a wastewater treatment facility on the Ranch. As part of that application, Young Life sought an NPDES permit to discharge wastewater from this proposed treatment facility into Crooked Creek, a small stream that runs through the Ranch before entering the Fraser River. An NPDES permit is required under the CWA and the Colorado Water Quality Act, C.R.S. §§ 25–8–101 to 25–8–703, for discharges of pollutants from a point source into waters of the United States. 33 U.S.C. §§ 1311(a), 1342(a); C.R.S. § 25–8–501(1). A violation of an NPDES permit also violates the CWA. 40 C.F.R. § 122.41(a); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). CDPHE administers the NPDES permit program in Colorado by delegation from the U.S. Environmental Protection Agency ("EPA"). *See* 40 Fed.Reg. 16713 (1975).

In response to CDPHE's consideration of Young Life's site and permit application, members of the public raised concerns that CDPHE lacked sufficient information about the volume of water in Crooked Creek, generally referred to as stream flow, to issue an NPDES permit authorizing the discharge of pollutants into the Creek. *See* Pl.'s Br., Exh. A (hereinafter "Summary of Permit Rationale") at 3; Exh. B. Such stream flow information is critical to the NPDES permitting process

because the permitting agency calculates the numerical limits for the amount of pollutants to be discharged under each permit based in part on the dilution that will occur in the receiving stream. Stream flow information is also necessary to determine whether the proposed discharges comply with federal and state antidegradation rules, which prohibit the degradation of water quality in protected watersheds. *See* 40 C.F.R. § 131.12; 5 C.F.R. § 1002–31.8 By rule, if the volume of the proposed discharge will be diluted by 100 to 1 or more by water in the stream at low flow, then CDPHE presumes that no degradation will occur. 5 C.F.R. § 1002–31.8(3)(c). CDPHE has found that Crooked Creek is subject to the antidegradation rules. *See* Summary of Permit Rationale at 8.

On April 29, 1999, CDPHE issued Young Life an NPDES permit ("Permit") authorizing it to discharge certain pollutants, including ammonia, fecal coliform bacteria, oil and grease, into Crooked Creek as part of the effluent from the wastewater treatment plant. The Permit requires Young Life to comply with specified numerical discharge limits, monitoring requirements, and other conditions set forth in the Permit. The Permit is effective for a five-year term beginning May 31, 1999.

In the Summary of Rationale for the Permit, also issued on April 29, 1999, CDPHE stated the permitted discharges complied with the antidegradation rule because the ratio of stream flow in Crooked Creek to permitted effluent discharges was 100:1 or greater. *Id.* CDPHE also reported it had calculated the stream flow used in this and other Permit-related determinations by extrapolating from stream flow data from the near-by St. Louis Creek drainage. *Id.* at 3. It acknowledged, however, that concerns had been expressed about the accuracy of this extrapolated data and that it was therefore

requiring Young Life "to install a continuous stream flow recorder and submit this data with the permit renewal application." *Id.; see id.* at 10.

The Permit's continuous stream flow recording requirement is set forth along with certain other site-specific monitoring requirements in the Permit as follows:

For the four year period between September 1, 1999 and August 31, 2003, the permittee will be *required to perform collection of continuous stream flow,* weekly pH, temperature, and ammonia monitoring of the effluent and *of Crooked Creek at a location above the discharge before any mixing has occurred.*

All data shall be submitted to the Division by November 30, 2003 with the renewal application.* The Division will determine if ammonia limitations and necessary ammonia removal facilities are required at this [sic] time.

*The permittee shall submit a preliminary report prior to [sic] beginning the monitoring study. The report shall be submitted by August 1, 1999. This report shall specify the exact instream locations where the permittee intends to perform the monitoring and what [sic] equipment will be utilized in the study.*

Complaint, Exh. B, NPDES Permit at 1c, Part I.A.8(a) (emphasis added); *see also* Summary of Permit Rationale at 3, 10.

In a letter to CDPHE dated July 27, 1999, Young Life reported the location and device it had selected for the required Crooked Creek stream flow study and stated it would measure the flow five times per week from May through October and once per week the rest of the year. By letter dated August 5, 1999, CDPHE official Karen Young responded that Young Life's "proposed monitoring methods and equipment are acceptable."

On August 26, 1999, Young wrote Young Life again "to clarify the requirement for a

continuous flow measuring device to record stream flows in Crooked Creek." In that letter, Young stated "the Division is proposing that [Young Life] take a daily single staff gauge and flow reading at the same time every day instead of the proposal you submitted." Def.'s Br., Exh. 2. She also "suggested" Young Life submit the flow data annually on June 1 for CDPHE review. *Id.* Young Life reports it has collected daily stream flow data for Crooked Creek since September 1, 1999.

By letter dated April 15, 2000, the Sierra Club provided Young Life, CDPHE, and the EPA with notice of its intent to bring this action upon expiration of the requisite 60–day notice period. *See* 33 U.S.C. § 1365(b)(1)(A) (requiring 60 days notice before bringing CWA citizen suit). On September 18, 2000, the Sierra Club filed this action pursuant to Section 505(a) of the Act, which authorizes any citizen, defined as "a person or persons having an interest which is or may be adversely affected," to bring suit to enforce any limitation or requirement in an NPDES permit. *See* 33 U.S.C. § 1365; *Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. at 174, 120 S.Ct. 693.

In its complaint, the Sierra Club alleges Young Life has violated and continues to violate the Permit by failing to install and maintain a continuous stream flow recorder on Crooked Creek. The Sierra Club seeks declaratory and injunctive relief for this and related Permit violations, civil penalties payable to the EPA, and attorneys fees and costs as authorized by the CWA. Young Life concedes it has not installed a continuous stream flow recorder, but claims it has not violated the Permit because CDPHE, through the August 26, 1999 Young letter, sanctioned the daily stream flow measurements Young Life asserts it is currently performing.

## II. Young Life's Motions

Young Life makes four arguments in the motion before me: (1) Sierra Club's complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(7) for failure to join an indispensable party; (2) Sierra Club's second and third claims for relief should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted; (3) Sierra Club's claims should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) for lack of standing and/or the Sierra Club should be required to make a more definite statement of its standing allegations; and (4) certain words should be stricken from Sierra Club's complaint pursuant to Rule 12(f). Each of these arguments are addressed below as if they were separate motions.

▮ Both parties have submitted affidavits and other evidence in support of their arguments for and against Young Life's motions. With the exception of Young Life's motions to dismiss pursuant to Rule 12(b)(6), I may consider such extraneous materials outside the pleadings in ruling on these motions.[1] *See Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir.2000) (materials outside the pleadings considered in deciding 12(b)(1) motion to dismiss); *Citizen Band Potawatomi Indian Tribe v. Collier*, 17 F.3d 1292, 1293 (10th Cir.1994) (same with respect to 12(b)(7) motion to dismiss). With respect to Young Life's Rule 12(b)(6) motions, I have discretion whether to consider extraneous materials, but if I choose to do so, I must convert these to motions for summary judgment and ensure the parties have notice of this action and an opportunity to present relevant evidence. *See* Fed.R.Civ.P. 12(b)(6); *David. v. City and County of Denver*, 101 F.3d 1344, 1352 (10th Cir.1996).

---

**1.** Such materials are irrelevant and will not be considered in deciding Young Life's motions for a more definite statement and to strike portions of Sierra Club's complaint.

In this case, I opt not to consider these extraneous materials in deciding Young Life's Rule 12(b)(6) motions to dismiss. Accordingly, I will decide the 12(b)(6) motions based on the pleadings, which are deemed to include documents that are central to plaintiff's claims and referred to and/or attached to the complaint. *Prager v. LaFaver,* 180 F.3d 1185, 1189 (10th Cir. 1999). Under this rule, I may consider the Permit, which is referred to and attached to the Sierra Club's complaint, in deciding Young Life's Rule 12(b)(6) motions and, of course, its other motions as well.

### A. Motion to Dismiss for Failure to Join the State of Colorado

 Young Life argues the State is an indispensable party in this action pursuant to Fed.R.Civ.P. 19(a) and, because it will not waive its Eleventh Amendment immunity to suit, this action must be dismissed pursuant to Fed.R.Civ.P. 19(b) and 12(b)(7). In considering this argument, I proceed through a three-step analysis. *United States v. Bowen,* 172 F.3d 682, 688 (9th Cir.1999). First, I determine whether the absent party is "necessary" under the terms of Rule 19(a). *Id.* If it is, I next consider whether it is "feasible" to join the party. *Id.* If the absent party is necessary to the action but cannot be joined, then I must determine whether the absent party is "indispensable" as defined by Rule 19(b), which requires me to determine whether in "equity and good conscience" the action can continue without the party. *Id.*

In this case, the parties agree it is not feasible to join the State in this action

because it has not waived its sovereign immunity to suit under the Eleventh Amendment. Accordingly, my analysis will focus on whether the State is a "necessary" party as defined by Rule 19(a) and, if it is, whether it is an "indispensable" party under Rule 19(b) such that this case must be dismissed in its absence.

### 1. Whether the State is a necessary party

 Young Life argues the State is a necessary party pursuant to Rule 19(a)(2), which provides that a person should be joined if "[1] the person claims an interest relating to the subject matter of the action and [2] is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Young Life, as the party moving for dismissal, has the burden of producing evidence demonstrating that the State is a necessary party. *See Collier,* 17 F.3d at 1293.

Young Life submitted an affidavit from David A. Akers, a manager in CDPHE's Water Quality Control Division, in support of its contention that CDPHE claims an interest in this action. *See* Def.'s Br., Exh. 3. In his affidavit, Akers asserts this action may affect the Division's interest in protecting its administrative authority over Colorado's NPDES permit program. Assuming *arguendo* this claimed interest is sufficient under Rule 19(a),[2] whether the

---

**2.** The Sierra Club argues this claimed interest is too speculative for CDPHE to be a necessary party under Rule 19(a). Because I find CDPHE is not a necessary party on other grounds, I need not decide this issue. I note, however, that the Tenth Circuit recently stated that Rule 19 requires only that movant

show that the absent person *"claims an interest* relating to the subject of the action" and that it "excludes only those *claimed* interests that are patently frivolous." *Citizen Potawatomi Nation v. Norton,* 248 F.3d 993, 998 (10th Cir.2001) (emphasis in original; internal quotations omitted).

State is a necessary party turns on satisfaction of the additional requirements stated in subsections (a)(2)(i) and/or (a)(2)(ii) of the Rule.[3] Young Life contends the State is a necessary party pursuant to both of these subsections.

### (a) Rule 19(a)(2)(i): Whether disposition of this action will as a practical matter impair or impede the State's interests

■ Young Life argues the State is a necessary party under this standard because the Sierra Club is attempting to reverse CDPHE's decision approving Young Life's daily stream flow monitoring regimen and is challenging the State's authority to interpret and administer NPDES permits it has issued. Young Life argues, therefore, that the Sierra Club's real dispute is with the State, not Young Life, and that disposition of the action in the State's absence would as a practical matter impair or impede the State's ability to protect its interests in administering Colorado NPDES permits.

■ I do not agree. The Sierra Club's complaint states allegations against Young Life only, not the State. It is not seeking to change the terms of the Permit approved by CDPHE, only to enforce the Permit terms as written. There is no question this is the proper subject of a CWA citizen suit, *see* 33 U.S.C. § 1365; *Citizens for a Better Environment–California v. Union Oil Co.*, 83 F.3d 1111, 1119 (9th Cir.1996) (CWA citizen suit provision authorizes citizen suit against violator of NPDES permit conditions), and that Congress' purpose in allowing such suits was to ensure enforcement of federal environmental requirements "irrespective of the failings of agency participation." *Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir.1976). For this reason, it has long been settled that federal and state agencies that administer federal environmental programs are not necessary, let alone indispensable, parties to citizen suits to enforce permitting and other federal environmental requirements against alleged violators. *See, e.g., id.* ("since it is [the governmental agency's] failure to obtain compliance and to seek enforcement that brings the citizen suit into play, it would defeat the very purpose of that enforcement mechanism to require that the [agency] be dragged reluctantly into the enforcement proceedings"); *Metro. Wash. Coalition for Clean Air v. District of Columbia*, 511 F.2d 809, 814–15 (D.C.Cir. 1975) (when citizen proceeds directly against violator, government agency "has the right to intervene in the suit, but [it] is not required to be a participant in such litigation and [its] absence does not render the action infirm"); *Student Pub. Interest Research Group v. Monsanto Co.*, 600 F.Supp. 1479, 1484 (D.N.J.1985) (no government agency interests impaired or impeded by citizen suit because "[t]he agencies, after all, are not free to condone violations of permits they issued while those permits are still in effect").

That CDPHE has taken actions or positions relating to the terms of Young Life's NPDES permit does not change this rule or convert this citizen suit to enforce the Permit into a challenge to the validity of CDPHE's post-Permit actions. The sub-

---

**3.** In a notice of supplemental authority, Young Life incorrectly asserts the Tenth Circuit recently "embraced the standard that a Rule 12(b)(7) movant need show *only* that the absent person claims an interest relating to the subject matter of litigation to be 'necessary' under Rule 19(a)." Def. Notice to Court (July 17, 2001) (emphasis added). In the supplemental authority, *Citizen Potawatomi Nation v. Norton*, 248 F.3d 993 (10th Cir. 2001), the Tenth Circuit quite clearly recognized that Rule 19(a) states additional requirements for demonstrating a party is necessary. *See id.* at 997.

ject of this action is Young Life's compliance with the Permit and specifically its continuous stream flow monitoring requirement, not the validity of CDPHE's post-Permit representations to Young Life regarding this requirement.[4] *See Citizens for a Better Environment–California v. Union Oil,* 83 F.3d 1111, 1119 (9th Cir. 1996). Accordingly, the general rule that the permitting agency is not a necessary party, pursuant to Rule 19(a)(2)(i) or otherwise, to a citizen environmental suit to enforce the terms of a federally-required permit is fully applicable here.

In arguing against this conclusion, Young Life fails to identify any citizen environmental suit in which a court held the responsible government agency was a necessary party because disposition of the action in the agency's absence could impair or impede its ability to protect its interests in the federal environmental program at issue. Instead, Young Life relies principally on *Bell Atlantic–Maryland, Inc. v. MFS Intelenet, Inc.,* No. S 99–2061, 1999 U.S. Dist. LEXIS 16477 (D.Md. Oct. 20, 1999), *aff'd on other grounds sub nom. Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc.,* 240 F.3d 279 (4th Cir. 2001), in which the court found Maryland's Public Service Commission to be an indispensable party because the plaintiff was directly challenging a published Commission order. *Id.* at *20–*22. No such challenge is being directed against CDPHE in this action. The Sierra Club is seeking to enforce the Permit as issued by CDPHE, not to invalidate it.

**(b) Rule 19(a)(2)(ii): Whether disposition of this action will leave any of the parties subject to a substantial risk of multiple or inconsistent obligations.**

■ Young Life further contends the State is a necessary party because resolution of the dispute would lead to a "substantial risk of incurring multiple or inconsistent obligations" within the meaning of Rule 19(a)(2)(ii). Again, I disagree. Young Life's argument assumes CDPHE's August 26, 1999 letter "proposing" that Young Life take a daily single staff gauge and flow reading actually requires Young Life to implement this monitoring protocol and is enforceable. It also assumes that no protocol other than that proposed by CDPHE in August, 1999 would satisfy the agency or comply with the Permit's continuous stream flow monitoring requirement. The latter assumption, at minimum, is unsupported by the record and common sense. Just because CDPHE has apparently been willing to date to accept daily stream flow measurements in lieu of more frequent or "continuous" flow measurements does not mean CDPHE would reject continuous stream flow data or require Young Life to continue daily flow measurements if the Court ultimately determines a *continuous stream flow recorder is re-*quired under the Permit. The risk of CDPHE taking such an unreasonable position is minimal, if it exists at all. Accordingly, there is not, as a practical matter, a "substantial risk" that Young Life will be subject to "multiple or inconsistent obli-

---

4. In so stating, I recognize that CDPHE's views on the meaning of the Permit's stream flow monitoring requirement may be relevant evidence in determining whether Young Life is currently complying with this requirement and/or the amount of any civil penalty if Young Life is found to be in violation. *See* 33 U.S.C. § 1319(d) (setting out factors for deter-

mining amount of civil penalty). I also recognize the parties dispute this point and the weight to be accorded to this evidence if it is considered in determining Young Life's compliance with the Permit. Because it is not necessary for me to resolve these disputes to decide Young Life's motion, I do not address them here.

gations" if the Sierra Club prevails in this action.

This conclusion is bolstered by Young Life's declaration, through Ranch Superintendent Adams, that should I find its current daily stream flow monitoring protocol does not comply with the Permit, it will petition CDPHE "to modify the permit to expressly require only a once-per-day reading." If, as Young Life contends, CDPHE is insistent on daily stream flow monitoring, then it will grant this petition and modify the Permit as requested. Any multiple or inconsistent obligations resulting from disposition of this action would thereby be avoided. Of course, before granting this petition, CDPHE would be required to comply with the procedural and substantive requirements for modifying an NPDES permit, including providing a meaningful opportunity for public comment.

Young Life attempts to analogize this case to *Hudson Riverkeeper Fund, Inc. v. Orange & Rockland Utilities, Inc.*, 835 F.Supp. 160 (S.D.N.Y.1993), a CWA citizen suit for violation of an NPDES permit in which the court found the state permitting agency was a necessary party under Rule 19(a)(2)(ii) because granting the plaintiff injunctive relief would have put the defendant at substantial risk of violating another permit provision. *Id.* at 167. Young Life has not presented evidence that the relief the Sierra Club seeks, compliance with the Permit's continuous stream flow monitoring requirement, poses an equivalent risk to Young Life of inconsistent obligations under its Permit.

### 2. If the State is a necessary party, whether it is indispensable to this action

■ Even if the State were a necessary party to this action, I would still deny Young Life's motion to dismiss because the State is not indispensable to this action.

Rule 19(b) requires that 1 determine "in equity and good conscience" whether this action should proceed in the absence of a necessary but unjoinable person by considering four factors. With respect to the first factor, the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties, *see id.*, Young Life asserts that judgment in the Sierra Club's favor would prejudice both it and the State because it would undermine CDPHE's permitting authority and cause Young Life to be subject to multiple and inconsistent obligations. These recycled arguments are rejected for the reasons stated above.

Young Life further argues it would be prejudiced by having to "pay civil penalties or, adding insult to injury, the attorney fees of its adversary, simply for having done what the State directed." This alleged "prejudice," however, has nothing to do with the State's presence or absence from this suit. In addition, any party in any case could argue it will be prejudiced if its opponent prevails. The risk of a court rendering judgment against the party seeking dismissal is not a reasonable factor to be considered in determining whether an absent party is indispensable under Rule 19(b).

The second Rule 19(b) factor to consider is the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided. Because I find no prejudice to the State or Young Life in the State's absence, this factor also does not support a finding that the State is an indispensable party in this action.

The third Rule 19(b) factor is whether a judgment rendered in the State's absence will be adequate. Young Life argues it will not because the State will not be bound by the judgment and will require Young Life to take daily stream flow mea-

surements in addition to whatever the Court orders and because Young Life will continue the controversy by seeking to amend the Permit to require only daily stream flow measurements. For the reasons stated earlier, I am not persuaded by these arguments that a judgment in the State's absence would be inadequate. Young Life's arguments on this point also fail to recognize that this Rule 19(b) factor focuses on whether the court can grant *plaintiff* an adequate remedy for the alleged wrong in the necessary person's absence. See Fed.R.Civ.P. 19(b) advisory committee's note (1966); 7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1608, at 116 (2d ed.1986). Young Life does not dispute that complete relief can be accorded to the Sierra Club in the State's absence.

Finally, with respect to the fourth Rule 19(b) factor, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder, Young Life first contends that the Sierra Club has other available remedies, and then argues that even if the Sierra Club is left without a remedy, I should still dismiss this action. Young Life's proposed alternatives for Sierra Club are that it petition CDPHE to amend Young Life's Permit or collect its own continuous stream flow data for Crooked Creek to submit in connection with the Permit's renewal in 2004. Neither are substantially equivalent to the remedy the Sierra Club seeks in this action. Furthermore, the cases Young Life cites in support of dismissal even if the Sierra Club lacks an adequate alternative remedy are all easily distinguishable because in those cases there were factors supporting dismissal in the absence of the necessary party. In this case, as described above, none of the factors set forth in Rule 19(b) support dismissal of this action in the State's absence.

■ Finally, Young Life argues the State is an indispensable party and this action should be dismissed because I should defer to CDPHE's authority to oversee and interpret NPDES permits. The Sierra Club, however, is challenging Young Life's actions vis-a-vis its Permit, not the CDPHE's "interpretation" of the Permit. Young Life has an absolute duty to comply with its NPDES permit. See *Wiconisco Creek Watershed Ass'n v. Kocher Coal Co.*, 646 F.Supp. 177, 178 (M.D.Pa. 1986). This duty remains regardless of oral or written representations by the permitting agency allegedly excusing compliance with permit requirements. See Pub. *Interest Research Group v. Yates Indus., Inc.*, 757 F.Supp. 438, 445 (D.N.J.1991) (denying motion to dismiss based on permitting agency's representations, without formal modification of permit, that certain permit requirements would not be enforced); *Student Pub. Interest Research Group v. Anchor Thread Co.*, 15 Envtl. L. Rep. 20964, 20966, 1984 WL 178938 (D.N.J.1984) (citizens not estopped from enforcing NPDES permit because of waiver or inaction by government officials). Whether Young Life is currently in compliance with the Permit will be determined by this Court. On balance, Young Life's arguments for finding the State to be an indispensable party under Rule 19 are unpersuasive. The lawsuit against Young Life can proceed in the State's absence.

**B. Motion to Dismiss the Sierra Club's Second and Third Claims**

■ Young Life moves to dismiss the Sierra Club's Second and Third Causes of Action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In these claims, the Sierra Club alleges Young Life has violated the Permit, and thereby the CWA and its implementing regulations, by "fail[ing] to install, calibrate, use and maintain con-

tinuous stream flow monitoring equipment in Crooked Creek" (Second Cause of Action) and by "fail[ing] to maintain records of continuous stream flow in Crooked Creek" (Third Cause of Action). In considering this motion, I accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999). The motion must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle it to relief. *Id.*

Young Life's argument for dismissal of the challenged claims is based on the structure and language of the Permit. As relevant here, Part I of the Permit has three sections: A, "Terms and Conditions"; B, "Monitoring Requirements"; and C, "Additional Monitoring Requirements." Section I.A generally defines the scope of activities and discharges authorized under the Permit, including limitations on and standards for operation of the treatment facility and the volume, composition and management of influent, effluent and biosolids at the facility. It also contains the base Permit requirement at issue in this action, that Young Life monitor continuous stream flow in Crooked Creek, in Section I.A(8). In addition to this requirement, Section I.A(8) requires Young Life to monitor Crooked Creek and effluent from the wastewater treatment plant for ammonia, weekly pH, and temperature and to report to CDPHE the exact location of its intended instream monitoring location for this and the mandated stream flow monitoring.

Section I.B of the Permit sets out various other monitoring requirements, including specifics on the sampling locations, frequency, and other procedures for Young Life to monitor influent, effluent, and biosolids for purposes of determining its com-

pliance with the limitations and other requirements stated in Section I.A. *See, e.g.,* Permit, § I.B.3. Section I.C sets out additional monitoring requirements, including in subsections I.C.3 and I.C.4, the monitoring methods and equipment and record-keeping requirements that are the basis of the Sierra Club's second and third claims. *See id.* § I.C.3, I.C.4.

Young Life argues these second and third causes of action fail to state a claim because Section I.C and its requirements do not, as a matter of law, apply to the stream flow monitoring required by Section I.A.8. It bases this contention on Section I.C.1, titled "Representative Sampling," which provides in relevant part: "Samples and measurements taken *for the respective identified monitoring points as required herein* shall be representative of the volume and nature of: 1) *all influent wastes* received at the facility ...; 2) *the monitored effluent* discharged from the facility; and 3) *biosolids* produced at the facility. All samples shall be taken at *the monitoring points specified in this permit* ...." Permit, § I.C.1 (emphasis added). Young Life contends the plain language of this provision limits all of Section I.C, including the subsections relied upon by the Sierra Club in its second and third claims, only to the monitoring points "specifically identified" in Section I.C.1, which it claims do not include the location at which Young Life is collecting stream flow data.

I read Section I.C.1 and the Permit differently and therefore deny Young Life's motion to dismiss the challenged claims. First, there is nothing in the plain language of section I.C.1 or the remainder of Section I.C suggesting that subsection I.C. defines and limits the scope of all of the monitoring requirements set forth in Section I.C. Each of these requirements is set forth in a separate subsection with a heading and detailed description of the

requirement. The subsections relied upon by the Sierra Club are titled "Analytical and Sampling Methods for Monitoring" and "Records" and contain no language limiting their application in the manner claimed by Young Life. Reading Section C in its entirety, it is clear these subsections set forth requirements independent of those stated in Section I.C.1 and that these requirements apply to all monitoring required under the Permit.

Young Life's reading of Section I.C.1 itself also does not withstand scrutiny. This section does not identify specific monitoring locations as Young Life argues, but rather refers to "monitoring points specified in this permit" and "identified monitoring points as required herein." There can be no dispute that the points for performing the monitoring required by the Permit are set forth in Sections I.A and I.B of the Permit, *see, e.g.,* Permit, § I.B.3 ("Self-monitoring samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s): Discharge point 001A"), and include, in Section I.A.8, a location on "Crooked Creek at a location above the discharge before any mixing has occurred," Permit, § I.A.8. That monitoring at this location does not address influent wastes, effluent discharges, or biosolids, the three "monitoring points" Young Life contends are stated in Section I.C.1, does not alter the fact that this upstream stream location is a monitoring point specified in the Permit. Therefore, even if Section I.C.1 did somehow limit the scope of all of Section I.C to the monitoring points referenced Section I.C.1, it would include the stream flow monitoring point identified in Section I.A.8 of the Permit.

## C. Motion to Dismiss for Lack of Standing and/or for a More Definite Statement on Standing

A motion to dismiss asserting that the plaintiff does not have standing to maintain the action is a challenge to the Court's subject matter jurisdiction brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Such a motion may be granted only when " 'it appears beyond doubt that the plaintiff could prove no set of facts entitling it to relief.' " *United States v. Colo. Supreme Court,* 87 F.3d 1161, 1164 (10th Cir.1996) (quoting *Ash Creek Mining v. Lujan,* 969 F.2d 868, 870 (10th Cir.1992)). Although the Sierra Club will ultimately be required to prove its standing in the same manner as any other matter on which it bears the burden of proof, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), at this point in the litigation I accept its well-pleaded facts as true and construe all reasonable allegations in the light most favorable to it. *See Colo. Supreme Court,* 87 F.3d at 1164.

To satisfy Article III's standing requirements, a plaintiff must establish three elements: (1) it has suffered an "injury in fact" an invasion of a legally protected interest—that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical;" (2) there is a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant;" and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[5] *Laidlaw Envtl Servs. (TOC), Inc.,* 528 U.S. at 180–81, 120 S.Ct. 693.

---

**5.** The courts have also developed prudential limitations on a party's standing. *See, Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sac & Fox Nation v. Pierce,* 213 F.3d 566, 573 (10th Cir.2000), *cert. denied,* 531 U.S. 1144, 121 S.Ct. 1078, 148 L.Ed.2d 955 (2001). These limitations are not at issue in this case.

An organization has standing to sue if it can demonstrate an injury to itself and the other constitutional elements for standing. *See Comm. to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 447 n. 3 (10th Cir.1996). In addition or in the alternative, an organization has so-called "representational standing" to sue "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181, 120 S.Ct. 693; *Comm. to Save the Rio Hondo v. Lucero,* 102 F.3d at 447 n. 3.

In its complaint, the Sierra Club states it is acting "on its own behalf and on behalf of its adversely affected members." Complaint, ¶ 6. Young Life moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) "any claims the Sierra Club is bringing on its own behalf" on the ground that the Sierra Club has failed to allege any cognizable injury-in-fact to the organization. In so doing, Young Life expressly concedes it is *not* at this point challenging the Sierra Club's standing to sue on behalf of its members. Def. Reply Br. at 14. Instead, it moves for a more definite statement pursuant to Fed.R.Civ.P. 12(e) with respect to the Sierra Club's allegations of standing on this basis, contending that these allegations are too vague to allow it to determine whether the Sierra Club's members would have standing to sue in their own right.

At the outset, I reject Young Life's attempt to parse the Sierra Club's claims to dismiss for lack of standing "any claims the Sierra Club is bringing on its own behalf." There is one plaintiff in this action bringing one set of claims. All that is required to satisfy Article III is that the Sierra Club have standing on some basis to bring these claims. Whether the Sierra Club has standing to sue on its own behalf as opposed to standing to sue on behalf of its members is of no consequence so long as the Sierra Club has standing on one of these bases. *See Comm. to Save the Rio Hondo,* 102 F.3d at 447 n. 3 ("An association has standing to sue even if it has not been injured itself so long as the association's members satisfy the constitutional minimum of Article III."). Even if Young Life is correct, therefore, that the Sierra Club does not have standing to sue on its own behalf, I cannot give it the relief it seeks, dismissal of the Sierra Club's claims, unless I also find the Sierra Club lacks standing to sue on its members' behalf.

Accepting the Sierra Club's well-pleaded allegations as true, there is no question the Sierra Club has established its standing to bring this action on behalf of its members. In support of the first requirement for representational standing, that its members have standing in their own right, the Sierra Club alleges:

Defendant's failure to comply with the Act, the regulations, and its Permit has injured the past, present, and future interests of plaintiff, and plaintiff's members, by adversely affecting aesthetic, environmental, recreational, public health, wildlife, due process, and procedural interests. These injuries are fairly traceable to the actions of defendant complained of herein. These injuries can be remedied by the relief requested herein.

Complaint, ¶ 7. These allegations address each element, injury-in-fact, causation, and redressability, necessary to the standing of the Sierra Club's members to bring this action on their own behalf. While general, these allegations are sufficient to establish the members' standing at this stage of the litigation. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 ("At the pleading stage, general

factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."); *Comm. to Save the Rio Hondo,* 102 F.3d at 449 ("In cases reviewing questions of standing under a motion to dismiss, the court presumes general allegations embrace those specific facts necessary to support the claim.").

■ The Sierra Club has also made allegations sufficient to establish the remaining requirements for representational standing. The requirement that the interests it seeks to protect in this Clean Water Act action be germane to its purposes is satisfied by the allegation that "the Sierra Club's concerns encompass issues related to clean water and the issuance and compliance with NPDES permits." Complaint, ¶ 6. It is also clear from the pleadings that neither these claims nor the relief requested by the Sierra Club require the participation of individual Club members in this lawsuit. Accordingly, the Sierra Club has adequately established, at this stage of the litigation, its standing to bring this action on behalf of its members. *See Comm. to Save the Rio Hondo,* 102 F.3d at 447 n. 3. Young Life's motion to dismiss the Sierra Club's claims for lack of standing is, therefore, denied.

■ For much the same reasons, Young Life's motion for a more definite statement regarding the Sierra Club's allegations of representational standing is also denied. Having found that the Sierra Club has sufficiently alleged the constitutional elements for representational standing, there is no basis for requiring it to make a more definite statement regarding these allegations. In addition, the level of detail Young Life seeks is inconsistent with the direction in Rule 8 that a plaintiff offer only "a short and plain statement of the grounds upon which the court's juris-

diction depends." Young Life's demand that the Sierra Club be required "to clearly identify the conduct complained of, to identify the members it claims are injured and what injuries each is claiming, specific facts showing how the conduct of Young Life complained of has caused those injuries, and how the claimed relief will redress each of those claimed injuries," Def.'s Br. at 28, can and should be pursued through discovery, not the pleadings.

**D. Motion to Dismiss or Strike References to Procedural and Due Process Rights**

■ Young Life takes issue with the following reference to public health, due process and procedural interests in paragraph 7 of the complaint: "[d]efendant's failure to comply with the Act, the regulations, and its Permit has injured the past, present, and future interests of plaintiff ... by adversely affecting ... *public health ... due process, and procedural* interests." Young Life argues that because these alleged injuries are immaterial, this court should either dismiss all of the Sierra Club's claims to the extent they rely on these alleged injuries, or strike these words from the complaint pursuant to Fed.R.Civ.P. 12(f).

Young Life's concern appears to be that the Sierra Club is attempting to state a claim that Young Life has violated its or its members' interests in violation of the Fourteenth Amendment. The section of the complaint in question does not state Sierra Club's claims for relief, however, but rather it gives its basis for standing. Thus it is clear on the face of the complaint, and confirmed by the Sierra Club in briefing on this motion, that the Sierra Club has not asserted a Fourteenth Amendment claim against Young Life. Since there is no such claim to dismiss, I deny Young Life's motion on this point.

I also deny Young Life's motion to strike the references in the Complaint to public health, due process, and procedural interests. Pursuant to Fed. R.Civ.P. 12(f), I may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." "The purpose of Rule 12(f) is to save the time and money that would be spent litigating issues that will not affect the outcome of the case." *United States v. Smuggler–Durant Mining Corp.*, 823 F.Supp. 873, 875 (D.Colo.1993). Because striking pleadings is generally a drastic remedy, *see id.*, motions to strike are usually only granted when the allegations have no bearing on the controversy and the movant can show that he has been prejudiced. *See Sierra Club v. Tri–State Generation & Transmission Assoc., Inc.*, 173 F.R.D. 275, 285 (D.Colo.1997).

I have no basis on which to strike the referenced language under this standard. As noted above, the section of the complaint in question gives its basis for standing. The Sierra Club justifies its mention of "public health" as one of its allegedly injured interests based on the nature of the pollutants, and its references to "due process" and "procedural" rights based on its and/or its members' participation in the permitting of the facility. Because of the heavy burden of proof on a Rule 12(f) movant and Young Life's failure to demonstrate prejudice, the motion to strike is denied.

### III. Conclusion

For the reasons stated above, Young Life's Motion to Dismiss and for other relief, Docket # 5, is **DENIED** in its entirety.