**WASTE ACTION PROJECT,**
Plaintiff–Appellant,

v.

**DAWN MINING CORP.; Newmont Gold, Defendants–Appellees.**

No. 96–36055.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1998.

Decided March 10, 1998.

Richard A. Smith of Smith & Lowney, Seattle, WA, for plaintiff–appellant.

Jeffrey W. Leppo, Karen M. McGaffey, and Karla J. Axell of Bogle & Gates, Seattle, WA, for defendants–appellees.

Before: BRUNETTI, RYMER, and KLEINFELD, Circuit Judges.

BRUNETTI, Circuit Judge.

The issue in this case is whether the Environmental Protection Agency (EPA) has authority under the Clean Water Act (CWA) to regulate the discharge of uranium mill tailings into the nation's waterways. In statutory terms, the question is whether uranium mill tailings are "pollutants" within the meaning of the CWA. The district court, in granting defendant mining companies' motion for summary judgment, answered this question in the negative. We have jurisdiction, 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

Dawn Mining Corporation (Dawn) began milling uranium at the Ford, Washington, site at issue in 1957. Until 1965, Dawn operated the site pursuant to a Source Material License granted by the Atomic Energy Commission. In 1969, Dawn resumed uranium processing under a Radioactive Materials License issued by the State of Washington. Dawn ceased milling operations in 1982.

Milling uranium concentrates the ore to produce material with substantially higher concentrates of uranium than that contained by the original ore. This process also generates significant amounts of byproduct materials known as tailings which contain residual levels of uranium. Dawn has disposed of tailings from the milling process at tailings disposal areas (TDAs) at the millsite. There are four TDAs currently at the site. From 1957 to 1965, Dawn disposed of tailings at TDAs 1 and 2, and from 1969 to 1981, at TDA–3. TDAs 1–3 are above-ground unlined disposal areas. As a result, contamination from the mill tailings disposed at these TDAs has migrated into groundwater and nearby Chamokane Creek.

In 1981, Dawn constructed a lined below-ground impoundment area, TDA–4, with the capacity to store up to forty-four million cubic feet of mill tailings. TDA–4 was the subject of an Environmental Impact Statement (EIS) prepared by the Washington Department of Social and Health Services. By 1982, when Dawn ceased milling operations, approximately four million cubic feet of tailings had been stored at TDA–4. According to Dawn, tailings disposed of at TDA–4 have not leaked or otherwise been released.

Since 1982, Dawn has worked with federal and state agencies to develop a Closure Plan for the millsite. The Closure Plan includes a comprehensive remedial program that addresses the surface and groundwater contamination resulting from leakage at TDAs 1–3 and requires Dawn to remove contaminated groundwater. Dawn has constructed a system of lined evaporation ponds on top of TDAs 1–3. The ponds are intended to serve as partial caps and reduce further infiltration of water into the tailings material underneath. Dawn will pump contaminated groundwater from the aquifer into the lined evaporation ponds. When pumping groundwater is no longer necessary and the evaporation is complete, Dawn intends to close the ponds and construct a reclamation cover over the TDAs.

Dawn's closure plan has undergone extensive regulatory review. The Department of Health established a Technical Advisory Committee to analyze the closure proposal,

which included representatives from state and federal agencies, the Spokane Indian Tribe, and local citizens. The Department of Health also held numerous public hearings regarding the Plan, and prepared a lengthy EIS and Supplemental EIS (SEIS) in connection with its review of the Closure Plan. Copies of the EIS and SEIS were made available to the public. In February 1995, the Department of Health approved the Closure Plan and issued Dawn an amended radioactive material license authorizing closure of the millsite.

In 1994, Greg Wingard and Richard Smith formed Waste Action Project (WAP), the appellant in this action. WAP filed this Clean Water Act suit on February 20, 1996, against Dawn Mining Corporation and later amended its complaint to join Newmont Mining Company and Newmont Gold Company. The amended complaint alleges that Dawn is discharging pollutants into Chamokane Creek without a National Pollutant Discharge Elimination System permit (NPDES permit) in violation of the Clean Water Act (CWA). WAP alleges that wastes containing uranium, silica, heavy metals, sulfates, phosphates, chlorides, and other chemicals leaked from TDAs 1–4 into the groundwater and eventually to Chamokane Creek. Thus, WAP alleges that the discharge of these wastes into Chamokane Creek constitutes a violation of the CWA because Dawn does not possess a NPDES permit authorizing such discharges.

The Mining Companies moved for summary judgment and the district court ruled that the uranium mill tailings and associated wastes identified by WAP are "byproduct material" as defined in section 11(e)(2) of the Atomic Energy Act (AEA), 42 U.S.C. § 2014(e)(2), and hence are not "pollutants" under the CWA. We agree.

## II. DISCUSSION

■ We review decisions granting summary judgment de novo to determine whether there are any genuine issues of material fact and whether the district court properly applied the relevant substantive law. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.1997). Matters of statutory interpretation are also reviewed de novo.

*See United States v. Eaton*, 31 F.3d 789, 791 (9th Cir.1994).

■ This appeal presents a purely legal question of statutory interpretation. That is, whether uranium mill tailings are "pollutants" for purposes of the Clean Water Act's NPDES permit requirements. As a general rule, we look first to the plain language of the statute. However, where issues of interpretation of the CWA are involved, the United States Supreme Court opinion in *Train v. Colorado Public Int. Research Group*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), governs. *Train* specifically commands that in discerning the meaning of the language of the CWA, we must also look to the CWA's legislative history. *Id.* at 9–11, 96 S.Ct. at 1942–43. The Court in *Train* went even further, holding that to not look at legislative history would be reversible error. *See id.*

In *Train*, the Supreme Court addressed an issue virtually identical to that before our court today, specifically, whether the Environmental Protection Agency had authority under the Federal Water Pollution Control Act (FWPCA), now known as the Clean Water Act, to regulate discharge of nuclear waste materials subject to regulation by the Atomic Energy Commission and its successors under the Atomic Energy Act. The Court held unanimously that Congress did not intend for materials governed by the Atomic Energy Act to be included in the category of "pollutants" subject to regulation by the EPA under the FWPCA. *Id.* at 25, 96 S.Ct. at 1949.

A brief review of the legislative backdrop is necessary to appreciate the significance of *Train* in the present statutory context. The Clean Water Act was promulgated in 1972. It requires that an NPDES permit be obtained before discharging "pollutants" into navigable waters. 33 U.S.C. § 1311. "Pollutant" is defined as:

dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical waste, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar

dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

Under the CWA, the EPA is given authorization to enforce the act and promulgate regulations to that end. Accordingly, the EPA has further clarified the definition of "pollutants." Speaking directly to radioactive wastes, the EPA explicitly excludes radioactive materials regulated under the Atomic Energy Act from the definition of pollutant thereby putting these materials outside the scope of EPA enforcement. *See* 40 C.F.R. § 122.2; 38 Fed.Reg. 13528, 13530 (May 22, 1973). Further, EPA regulations provide that "[r]adioactive materials covered by the Atomic Energy Act are those encompassed in its definition of source, byproduct, or special nuclear materials." 40 C.F.R. § 122.2.

The Atomic Energy Act (AEA), enacted in 1954, created a comprehensive scheme under which the Atomic Energy Commission (AEC), now called the Nuclear Regulatory Commission (NRC), regulates the production, possession, and use of radioactive materials categorized as "source materials," "special nuclear materials," and "byproduct materials." 42 U.S.C. § 2011, et seq. Initially, the definition of "byproduct material" did not include uranium mill tailings. Nonetheless, the AEC did regulate uranium mill tailing disposal in connection with licensing of active uranium mill sites. *See* H.R. Rpt. No. 95–1480, Pt. I, *reprinted in* 1978 U.S.C.C.A.N. 7433; H.R. Rpt. No. 95–1480, Pt. II, *reprinted in* 1978 U.S.C.C.A.N. 7450, 7455.

Congress amended the AEA with passage of the Uranium Mill Tailings Radiation Control Act (UMTRCA) in 1978. The UMTRCA explicitly included uranium mill tailings/waste in the definition of "byproduct material." "Byproduct material" is defined as:

(1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.

42 U.S.C. § 2014(e) (also known as AEA § 11(e)(2)).

Additionally, the UMTRCA granted the EPA authority to promulgate standards of general application for the protection of the public health, safety, and the environment from hazards associated with the possession, transfer, and disposal of byproduct materials as defined in section 11(e)(2). 42 U.S.C. § 2022(b). The EPA was not given authority to enforce any standards they set, however. Only the NRC has authority to implement and enforce EPA standards established pursuant to § 2022(b). *Id.*

Under section 301 of the CWA, "the discharge of any pollutant" into waters of the United States without an NPDES permit authorizing the discharge is unlawful. 33 U.S.C. § 1311(a). Accordingly, the CWA's prohibition against unpermitted discharge applies to "pollutants" only.

Appellant WAP argues that uranium mill tailings are "pollutants" under the CWA such that discharge of tailings without an NPDES permit violates the CWA. WAP relies on a view of the legislative history to argue that the AEA, as amended by the UMTRCA, "preserves" EPA regulatory control over uranium mill tailings pursuant to enactment of the CWA, because such tailings were not explicitly included in the AEA at the time the CWA was enacted. We disagree.

First, a plain reading of the statutes, as amended, shows that uranium mill tailings are not within the scope of EPA regulation under the CWA. While it is true that uranium mill tailings were not explicitly included in the definition of "byproducts" under the AEA at the time the CWA was enacted, the section 11(e)(2) of the AEA as amended does include uranium mill tailings in the definition of "byproducts" of radioactive materials. EPA regulations exclude "byproduct materials" as defined in 11(e)(2) from the definition of "pollutant" under the CWA. 40 C.F.R. § 122.2.

Second, Congress never intended to require NPDES permits for materials regulated under the AEA. Although the CWA

defines "pollutant" to include radioactive materials, the CWA's legislative history makes clear that Congress did not intend for the CWA to regulate any materials that the AEC was already regulating under the AEA. The House Committee Report states:

> The term "pollutant" as defined in the bill includes "radioactive materials." These materials are those not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to the Act. "Radioactive materials" encompassed by this bill are those beyond the jurisdiction of the Atomic Energy Commission.

H.R.Rep. No. 92–911, at 131 (1972), 1 Leg. Hist. 818 (cited in *Train*, 426 U.S. at 11, 96 S.Ct. at 1943).[1] The AEA "created a pervasive regulatory scheme vesting exclusive authority to regulate" with the AEC and "preempting" regulation by other agencies. *Train*, 426 U.S. at 16, 96 S.Ct. at 1945. Thus, Congress intended to exclude materials regulated under the AEA from the definition of "pollutant" under the CWA.

Congress' adoption of the UMTRCA in 1978 did not alter the AEA's comprehensive regulatory scheme. Moreover, the legislative history rebuts contention that the EPA had always been regulating uranium mill tailings under the CWA. The UMTRCA does give the EPA authority to develop standards for the disposal of uranium mill tailings, but it in no way abrogates the pervasive power of the NRC to implement and regulate uranium mill tailings. According to the legislative history, section 206(e) of the UMTRCA:

> Title II (of the UMTRCA) reinforces the authority of the Nuclear Regulatory Commission to regulate the uranium mill process and mill tailings disposal. . . .

> Section 201 amends the definition of "byproduct material" in the Atomic Energy Act to include uranium mill tailings. Previously, tailings have been controlled through the licensing process for uranium mills. This amendment would subject tailings to specific licensing authority.

H.R.Rep. No. 1480, *reprinted in* 1978 U.S.C.C.A.N. 7433, 7442. Accordingly, the UMTRCA did not extend the EPA's power under the CWA to regulation of uranium mill tailings. Rather, it gave the EPA limited input in the area through the promulgation of standards which were to be implemented by the NRC.

WAP argues that the savings clause of the UMTRCA, 42 U.S.C. § 2022(e), which states that nothing in the UMTRCA changes the EPA's existing regulatory powers, impliedly asserts that the EPA has regulatory authority over uranium mill tailings because mill tailings were not previously defined as byproducts. We decline to attach to the savings clause the significance that WAP requests. Prior to enactment of the UMTRCA, the EPA was not regulating tailings. The NRC had been regulating uranium mill tailings at active sites under its licensing power, but it had no authority to regulate tailings at inactive sites. Thus, UMTRCA was enacted in part to close the regulatory gap and give NRC the express authority to regulate mill tailings at inactive sites. The savings clause did not take from the NRC the explicit power it had just been given.

Additionally, the EPA's consistent regulatory interpretation of the term "pollutant" supports the determination that uranium mill tailings are not "pollutants" for purposes of the CWA. The EPA has directly addressed the question of CWA application to materials regulated by the Atomic Energy Act several times since 1973. Each time the EPA has revised and repromulgated the CWA's implementing regulations, the EPA has clearly stated that materials regulated under the AEA, "as amended," are excluded from the CWA's definition of "pollutant." For example, in 1979, after Congress enacted the UMTRCA and amended the AEA to include uranium mill tailings within the definition of byproduct materials, the EPA revised and repromulgated its original CWA regulations to cite the *Train* decision, and to explain that "only radioactive materials which are not en-

---

1.  Citations to "Leg. Hist." refer to a two-volume Committee print for the Senate Committee on Public Works, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. (1973).

compassed in the definition of source, by-product, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act" are pollutants for purposes of the Clean Water Act. 44 Fed.Reg. 33290, 33422–23 (May 19, 1980).

Finally, the unanimous Supreme Court decision in *Train* guides us today. In 1976, the Supreme Court held that "the 'pollutants' subject to regulation under the [CWA] do not include source, byproduct, and special nuclear material." *Train,* 426 U.S. at 25, 96 S.Ct. at 1949. Today we extend that holding to the present statutory context. Although the Court's decision predates the AEA amendments including uranium mill tailings as byproduct material, the legislative history relied on by the Court speaks with equal force to us today. The EPA has recognized this since the AEA amendments, and, the EPA continues to refer to *Train* in its regulations that exclude byproduct materials from the definition of pollutant. *See* 40 C.F.R. § 122.2.

## III. CONCLUSION

For the foregoing reasons, we hold today that uranium mill tailings are not "pollutants" for purposes of the Clean Water Act and hence are not subject to the EPA's NPDES permitting requirements. Accordingly, we affirm the district court's grant of summary judgment for the appellee Mining Companies.

**AFFIRMED.**