**ASSOCIATION TO PROTECT HAMMERSLEY, ELD, AND TOTTEN INLETS, a Washington non-profit corporation, Plaintiff–Appellant,**

v.

**TAYLOR RESOURCES, INC., Defendant–Appellee.**

No. 00–35667.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 2002.

Submission Withdrawn Jan. 18, 2002.

Resubmitted Aug. 6, 2002.

Filed Aug. 6, 2002.

Jennifer A. Dold and David S. Mann, Bricklin & Gendler, LLP, Seattle, WA, for the plaintiff-appellant.

Samuel W. Plauche, Buck & Gordon, Seattle, WA, for the defendant-appellee.

Joseph J. Mann, National Environmental Law Center, Boston, MA; F. Robert Studdert, National Fisheries Institute, Inverness, CA; Sylvia Quast, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC; Lori A. Howell, Maine Aquaculture Association, Eliot, ME; and Ronald L. Lavigne, Assistant Attorney General, State of Washington, Department of Ecology, Olympia, WA, for the amici curiae.

Before: THOMAS, GRABER and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

This case poses the interesting question whether the mussel shells, mussel feces and other biological materials emitted from mussels grown on harvesting rafts, and thereby entering the beautiful waters of Puget Sound, constitute the discharge of pollutants from a point source without a permit in violation of the Clean Water Act ("the Act"), 33 U.S.C. §§ 1251–1376. Preliminarily, we must also assess procedural issues that affect whether we now can decide this question.

The Association to Protect Hammersley, Eld, and Totten Inlets ("APHETI"), a non-profit organization composed of about 3,000 persons who reside along the southern shores of Puget Sound, sued Taylor Resources, Inc. ("Taylor"), a mussel-harvesting company, under the citizen suit provisions of the Act. APHETI sought:

(1) a judgment declaring that Taylor discharged pollutants from its mussel-harvesting facilities without a National Pollutant Discharge Elimination System ("NPDES") permit; (2) an order enjoining Taylor from discharging pollutants from its facilities until it obtained such a permit; and (3) an order imposing civil penalties for Taylor's alleged violations of the Act. The district court granted summary judgment in favor of Taylor, holding that Taylor's mussel-harvesting rafts did not violate the Clean Water Act. APHETI appeals. We reach the Clean Water Act claim and review de novo the district court's grant of summary judgment. *See Waste Action Project v. Dawn Mining Corp.*, 137 F.3d 1426, 1428 (9th Cir.1998). We affirm.

## I

The Clean Water Act, 33 U.S.C. §§ 1251–1376, aims to restore and maintain the "chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). To achieve these desirable goals, the Act "establishes a comprehensive statutory system for controlling water pollution. To that end, it establishes the ... NPDES permit system for regulating discharges of pollutants into waters of the United States." *Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 582 (6th Cir.1988).

A cornerstone of the Clean Water Act is that the "discharge of any pollutant" from a "point source" into navigable waters of the United States is unlawful unless the discharge is made according to the terms of an NPDES permit obtained from either the United States Environmental Protection Agency ("EPA") or from an authorized state agency. 33 U.S.C. §§ 1311(a), 1342; *see also Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). In Washington State, the Depart-

ment of Ecology ("Ecology") is authorized by the EPA to administer the Clean Water Act's NPDES program. *See* 33 U.S.C. § 1342(c)(1) (suspending the availability of federal NPDES permits once a state-permitting program has been submitted and approved by the EPA). With these salient legal principles in mind, we consider the dispute between APHETI and Taylor.

## II

Since the early 1990s, Taylor has run two mussel-harvesting facilities in Puget Sound's Totten Inlet, producing more than 20,000 pounds of mussels each year. With these facilities, Taylor harvests gallo mussels, a species of mussels present in Puget Sound for about twenty-five years.[1]

Taylor attaches what are termed "mussel brood stock" or mussel "seeds"—that is, what we might consider to be "infant" mussels if personified—to suspension ropes that hang from floating rafts. Leading from Taylor's rafts, the suspension ropes are immersed and then anchored to the sea floor, surrounded by mesh netting designed to protect the mussels from predators. Taylor does not add fish food or chemicals to the water; the mussels are nurtured exclusively by the nutrients found naturally in the waters of Puget Sound, with nothing added. It is nature and the vibrant waters of Puget Sound that transform the mussel "seeds" into edible mussels worthy of admiration and human appetite.

But here's the rub, the environmental issue, as APHETI sees it: The tiny mussels have their commensurate physical and chemical processes. And as a byproduct of their metabolism, the mussels harvested at Taylor's facilities produce and release, as particulate matter, feces and pseudofeces, and they generate dissolved materials in the form of ammonium and inorganic phosphate (collectively, "mussel byproduct"). Also, gallo mussel shells have appeared on the beaches of Totten Inlet since the mid–1990s. There is no doubt that mussel byproduct and mussel shells are released from Taylor's facilities and, in this sense, they are adding something, however small, to the Sound's abundant waters. But it must also be recognized that the mussels act as filters and are considered by many to enhance water quality by filtering excess nutrients or other matter in the water that can be destructive to marine environments.[2]

1. Gallo mussels were first brought to Puget Sound in the 1970s and 1980s by mussel harvesters. However, *amicus curiae* Pacific Coast Shellfish Growers Association suggests that gallo mussels may have also independently found their way to Puget Sound by (1) hybridizing with sibling species of mussels or (2) migrating northward along the Pacific coast. Whatever their ticket to Puget Sound, gallo mussels now reproduce naturally in Puget Sound, albeit in limited numbers, and have been observed in locations isolated from any mussel-harvesting facilities.

2. Several Puget Sound area Native American Tribes submitted letters as *amicus curiae* in strong and unequivocal support of Taylor and argued, among other things, that their own historical shellfish-harvesting methods, which are similar in design to Taylor's methods, serve to enhance water quality. For example, the Squaxin Island Tribe wrote that it relies on a high standard of water quality for its aquacultural activities and that "shellfish populations are a regulating species, helping to consume and control excess nutrients added to the water from other sources." Similarly, the Port Gamble S'Klallam Tribe wrote that "because of their formidable water filtration capabilities, mussel rafts have actually been proposed as a means to improve water quality in embayments where poor circulation and point source discharges threaten water quality." Although we cannot make factual findings in our appellate review, we need not close our eyes to the positions of these independent Tribes, which have a deep historic familiarity with Puget Sound waters, with harvesting shellfish, and with concern for the environment.

Taylor's mussel-harvesting rafts, although not welcomed by all who reside along Puget Sound's southern shores, are not a rogue operation. Since Taylor began its operations, it has applied for and received all required permits for compliance with both the Washington State Environmental Policy Act and the National Environmental Policy Act. To comply with the Clean Water Act, Taylor sought to acquire an NPDES permit. Ecology, however, told Taylor that it would neither accept nor process Taylor's application for an NPDES permit. In Ecology's view, an NPDES permit was not required for Taylor's mussel-harvesting facilities.[3]

On August 18, 1997, the Director of Ecology responded in a letter to an APHETI member who had inquired whether an NPDES permit was required for mussel harvesting rafts. The Director of Ecology wrote that mussel-harvesting facilities do not violate the Clean Water Act because "shellfish farmers do not need to add fish food (nutrients) to the water to promote shellfish growth." Not persuaded, APHETI, on August 18, 1999, filed a complaint under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, alleging that Taylor had violated the Act by "discharging pollutants," such as mussel feces, mussel shells, and ammonia from its rafts into the Puget Sound without an NPDES permit. *See* 33 U.S.C. §§ 1311, 1342. APHETI claimed that particles and chemicals emitted from the mussels were "pollutants," that Taylor's harvesting rafts were "point sources," and that Taylor therefore needed an NPDES permit to operate. APHETI sought civil penalties and an order enjoining Taylor from discharging pollutants from its facilities until Taylor obtained an NPDES permit.

The district court granted summary judgment to Taylor, holding that Taylor's facilities did not "discharge a pollutant" and that the mussels and mussel rafts were not "point sources." In this appeal, we must assess whether the district court's conclusions on these novel interpretive issues under the Clean Water Act were correct.

## III

At the threshold, we are faced with Taylor's contention that a private party cannot bring a Clean Water Act citizen's suit for unpermitted discharges when the state agency charged with administering the NPDES permit program has determined that such a permit is not required. Taylor's argument must be rejected because it runs squarely against the plain words of

---

**3.** Some *amicus curiae* oppose a requirement that Ecology issue NPDES permits for shellfish-harvesting facilities. They argue that such a requirement could divert the agency's administrative and financial resources away from regulating activities that significantly impair water quality. For example, the Jamestown S'Klallam Tribe writes that:

> [t]he application [of] the NPDES permit to mussel culture is a misuse of the Clean Water Act. Our Tribe is very familiar with the NPDES permit and other regulatory tools emanating from this Act. We work closely with both the U.S. Environmental Protection Agency and the Washington State Department of Ecology to insure that the water quality upon which we rely is protected ... The Jamestown S'Klallam Tribe will be directly and adversely affected if these limited agency resources are deflected from pollution prevention and directed toward attempting to apply the NPDES permit to shellfish farming.

This view was echoed by the People for Puget Sound, a non-profit conservation group with about 12,000 members in Washington State. That organization wrote that "Ecology acted appropriately in determining that the Taylor mussel rafts were not subject to the requirement for an NPDES permit. Unlike salmon net pens and other confined animal farming operations, we do not view this type of activity as meeting the EPA definition of 'point source.'"

the statute and would frustrate the purposes of the Clean Water Act's empowerment of citizen suit.

**A**

The Clean Water Act explicitly allows private citizens to bring enforcement actions against any person alleged to be in violation of federal pollution control requirements. 33 U.S.C. § 1365(a)(1); *see, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174–75, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). This right of private suit is subject to express procedural prerequisites: At least sixty days before filing a suit, the prospective citizen plaintiff must provide notice of the alleged violation to the EPA, the State where the alleged violation occurs, and the alleged violator. 33 U.S.C. § 1365(a)(1). If either the United States or the State decides to bring an enforcement action within sixty days, the private plaintiff cannot bring an independent action, but may only intervene in the government's suit. 33 U.S.C. § 1365(b). Here, APHETI gave sixty days' notice to the EPA and Ecology but neither agency brought an enforcement action. APHETI decided to proceed alone, and we must consider whether it has the right to do so despite inaction by the government and Taylor's arguments to the contrary.

▇ APHETI has satisfied the Act's explicit citizen suit notice requirements. Yet, Taylor contends that these protections are inadequate and that APHETI is nonetheless barred from bringing this citizen suit because Ecology has told the parties that NPDES permits are not required for mussel-harvesting facilities. In Taylor's view, APHETI should not be allowed to sue Taylor for the unpermitted discharge of pollutants when Ecology would neither accept nor process an NPDES permit application. We disagree.

Although the EPA or an authorized state agency may be charged with enforcement of the Clean Water Act, neither the text of the Act nor its legislative history expressly grants to the EPA or such a state agency the exclusive authority to decide whether the release of a substance into the waters of the United States violates the Clean Water Act. *See Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 566–67 (5th Cir.1996) (holding courts may determine in citizen suits whether discharged substance is pollutant even if EPA has not issued NPDES permit). Here, if EPA and Ecology decline enforcement, then they have no statutory or common law right to veto environmental review sought by a citizen who otherwise has complied with the Act. To the contrary, we must honor the Act's express provisions authorizing citizen suits in appropriate cases where procedural requirements are met. Congress thus empowered citizens to pursue enforcement of the Clean Water Act when all procedural requirements were satisfied. Because those requirements are met here, a citizen suit is authorized and the statutory issues whether Taylor "discharged pollutants" from a "point source" are within our jurisdiction. *See, e.g., id.* That Ecology has decided that an NPDES permit is not needed warrants consideration but does not divest the federal courts of jurisdiction. The State may choose to sit on the sidelines, but state inaction is not a barrier to a citizen's otherwise proper federal suit to enforce the Clean Water Act.[4]

---

4. We recognize that Clean Water Act citizen suits are often brought against persons who are violating the strictures of a NPDES permit, *see Cedar Point Oil Co.*, 73 F.3d at 566, but nothing in the Act limits citizen suits to only those claims where the alleged polluter has obtained an NPDES permit and violated its terms. Suit may also be brought where a party proceeds to discharge pollutants from a point source without a required permit. *See id.*

We have subject matter jurisdiction to hear APHETI's citizen suit.

## B

To support its argument that a citizen suit alleging unpermitted discharges cannot be asserted where an NPDES permit is not obtainable, Taylor relies on *Hughey v. JMS Development Corp.*, 78 F.3d 1523 (11th Cir.1996). In *Hughey*, a property owner filed a Clean Water Act citizen suit seeking to enjoin a real estate developer from discharging runoff from storm water without an NPDES permit, even though the delegated state agency would not issue NPDES permits for such discharges. The citizen plaintiff contended that the developer violated the "zero discharge" standard of the Act, 33 U.S.C. § 1311(a), which makes it unlawful to discharge any pollutant without an NPDES permit. The Eleventh Circuit rejected the citizen plaintiff's argument and held that a citizen suit cannot be maintained when: "(1) compliance with [the zero discharge] standard is factually impossible; (2) no NPDES permit covering such discharge exists; (3) the discharger was in good-faith compliance with local pollution control requirements that substantially mirrored the proposed NPDES discharge standards; and (4) the discharges were minimal." *Hughey*, 78 F.3d at 1530.

We have never adopted nor rejected the rule of *Hughey*, and would apply it here only if persuasive. However, because we conclude that *Hughey* by its terms would not preclude suit here, we need not reach the issue of its application in a case meeting its requirements. To explain why *Hughey*, even if adopted, would not preclude this suit, we must ponder only the first *Hughey* factor: whether compliance with a pollution control requirement is impossible. In *Hughey*, the Eleventh Circuit reasoned that relief could not be accorded to the citizen plaintiff because it is was impossible for the developer to comply with the Act's zero discharge standard. The court reasoned that "rain water will run downhill, and not even a law passed by the Congress of the United States can stop that." *Id.* But that is not the case here. In this case, there is no reason why Taylor cannot comply with the Act's zero discharge standard, if the mussel byproduct and shells are the discharge of pollutants from a point source and prohibited without a permit. Taylor, unlike the developer in *Hughey*, could simply cease operations to comply with the Act.[5] Because Taylor can abate the discharge of alleged pollutants by halting its operations, *Hughey* is distinguishable and does not detract from APHETI's statutory right of citizen suit.

## C

Taylor further contends that Ecology is a necessary party under the Clean Water Act and Federal Rule of Civil Procedure 19(a). We have already reviewed the substantive provisions that govern permitting and the citizen suit provisions of the Clean Water Act. Rule 19(a) provides in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an in-

---

**5.** Taylor's reliance on *Hughey* is further undermined by the Eleventh Circuit's caution that its holding be limited to cases "in which the *storm-water discharge* is minimal." *Hughey*, 78 F.3d at 1530 (emphasis added). Be- cause we conclude that Taylor has failed to satisfy the first factor set forth in *Hughey*, we need not consider whether the other *Hughey* factors are satisfied.

terest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Taylor stresses that APHETI is attempting to overturn Ecology's decision that Taylor's mussel-harvesting facilities do not require an NPDES permit to operate. And Taylor thus argues that Ecology will need to be joined as a party in order to accord relief or, alternatively, that any relief accorded in Ecology's absence will impair Ecology's interests in overseeing the State's NPDES program.

■ This case squarely presents an issue not previously decided by us: whether a state agency that administers the Clean Water Act's NPDES program is a necessary party to a citizen suit when that agency has decided that an NPDES permit is not required. We fully agree with other federal circuits that, without exception, have held, as Taylor acknowledges as a "general rule" in its supplemental briefing, that federal and state agencies administering federal environmental laws are not necessary parties in citizen suits to enforce the federal environmental laws. *See Friends of Earth v. Carey,* 535 F.2d 165, 173 (2d Cir.1976) (EPA not a necessary party in Clean Air Act citizen suit); *Metro. Wash. Coalition for Clean Air v. Dist. of Columbia,* 511 F.2d 809, 814–15 (D.C.Cir. 1975) (per curiam) (same); *see also Sierra Club v. Young Life Campaign, Inc.,* 176 F.Supp.2d 1070, 1078–80 (D.Colo.2001) (state not necessary party in Clean Water Act citizen suit); *Student Pub. Interest Research Group of N.J., Inc. v. Monsanto*

*Co.,* 600 F.Supp. 1479, 1484 (D.N.J.1985) (state and EPA not necessary parties in Clean Water Act citizen suit).

Although these cases addressed circumstances in which the citizen plaintiff was seeking to enforce the terms of an existing pollution abatement plan or NPDES permit that had been approved by the relevant agency, there is no sound reason to distinguish between the cases cited above and this case. The plain language of the Clean Water Act has created opportunity for citizen suit when government agencies do not act. We adopt the views of the Second Circuit and the District of Columbia Circuit in Clean Air Act cases where they accepted citizen suits without requiring joinder of a responsible government agency. In those Clean Air Act cases, it was the EPA that was not joined; in our Clean Water Act case, it is the delegated state agency that is not joined and that previously had determined that an NPDES permit is not required. The principle is the same: Whether a citizen is seeking to enforce the terms of an NPDES permit or a pollution abatement plan or, as here, the statutory requirements of the Clean Water Act, it is the government agency's alleged failure to act that "brings the citizen suit into play." *Carey,* 535 F.2d at 173.

Our conclusion that Ecology is not a necessary party is supported by direct analysis of the text of Rule 19(a). We first ask, under Rule 19(a)(1), whether Ecology is a necessary party under the theory that in its absence complete relief cannot be accorded to the parties: APHETI and Taylor. Here, the presence of Ecology will not preclude relief to either party. If APHETI were to win, Taylor could be ordered to terminate operations unless it obtains a permit, a form of relief that is available irrespective of Ecology's participation. Ecology might grant a permit allowing further operations [6] but, if not,

---

**6.** In supplemental briefing, Ecology has ad-

vised us that, if we hold the mussel-raft opera-

Taylor would have to pull in the ropes and dock the rafts, and in either event, our relief would be complete. Conversely, if Taylor were to win, there would be no need for Ecology to congratulate it or give condolences to APHETI, and again our relief would be complete. Ecology is not needed at all for federal court relief that is wholly adequate to resolve the dispute between APHETI and Taylor.

We next ask, under Rule 19(a)(2), whether Ecology "claims an interest relating to the subject of the action" and is so situated that our decision in Ecology's absence "may ... impair or impede [that] person's ability to protect that interest" or "leave [those] already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." This portion of the Rule is wholly inapplicable because Ecology does not claim an interest that will be impaired by this litigation,[7] and we see none. *See United States v. Bowen,* 172 F.3d 682, 688–89 (9th Cir.1999) (a claim of interest is an essential prerequisite to joinder under Rule 19(a)(2)). And Ecology's absence does not subject APHETI or Taylor to any multiple or inconsistent obligations.

Having determined that APHETI's citizen suit is within our jurisdiction despite Ecology's position that no permit is needed and having held that Ecology is not a necessary party under Rule 19(a),[8] we turn to the interpretive issues under the Clean Water Act.

## IV

We recur to the fundamental law described at the outset of our opinion: The "discharge of any pollutant" from a "point source" into navigable waters is unlawful under the Clean Water Act unless made per the terms of an NPDES permit obtained from Ecology as the authorized state agency. Because no permit was obtained before commencing the raft operations in the navigable waters of Puget Sound, we now address whether the materials naturally released by gallo mussels are "pollutant[s]" under the Clean Water Act.

The Act states:

The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, *biological materials,* radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6) (emphasis added). APHETI argues that the chemicals, fluids, shells and other materials released by Taylor's mussels meet the statutory definition of "pollutant" because these materials are "biological materials" and thus "pollutants" under the Act. A novel question is presented, but we conclude that APHETI's contention must be rejected to preserve the integrity of the Clean Water Act.

"It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smith-*

---

tions discharge pollutants from a point source, then Ecology will grant a permit.

**7.** Ecology states in its supplemental briefing: "This Court's resolution of this matter will not impair or impede Ecology's ability to protect its interest because Ecology recognizes that its decisions are subject to judicial review and

will issue an NPDES permit to Taylor if this Court concludes a permit is necessary."

**8.** Because we hold that Ecology is not a necessary party under Rule 19(a), we need not decide whether it is feasible to join Ecology, *id.,* or whether Ecology is an indispensable party under Rule 19(b).

*field, Ltd., v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (internal quotation marks and citation omitted). We begin with the language of the Clean Water Act and consider its illustrative pollutants. *See* 33 U.S.C. § 1362(6). The Act lists diverse examples of a "pollutant," and in this context the meaning of "biological materials" is not readily apparent.

 The doctrine of *ejusdem generis* suggests that the definition of "biological materials" is not as broad as APHETI argues. Under that doctrine, "[w]hen a statute contains a list of specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items." *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 834 (9th Cir.1999). Here, the more specific items in the illustrative list of pollutants, such as "radioactive materials," "wrecked or discarded equipment," "garbage," "sewage sludge," "solid waste," and "incinerator residue" support an understanding of the more general statutory term, "biological materials," as waste material of a human or industrial process.

Viewed in this context, mussel shells, mussel feces and other natural byproduct of live mussels do not appear to be the type of materials the drafters of the Act would classify as "pollutants." But it must also be acknowledged that the phrase "biological materials" could literally embrace the emissions at issue. For this reason, the statute is ambiguous on whether "biological materials" means *all* biological matter regardless of quantum and nature and regardless of whether generated by living creatures, or whether the term is limited to biological materials that are a waste product of some human process. In light of this ambiguity, we consider the congressional intent in passing the Clean Water Act. *See N.W. Forest Res. Council v.*

*Glickman,* 82 F.3d 825, 834 (9th Cir.1996) ("Where a statute is ambiguous, we may look to legislative history to ascertain [the statute's] purpose.").

In 1972, Congress passed the Clean Water Act amendments, 33 U.S.C. §§ 1251–1387, to respond to environmental degradation of the nation's waters. In the text of the Act, Congress plainly and explicitly listed the "protection and *propagation* of . . . shellfish" as one of the goals of reduced pollution and cleaner water. 33 U.S.C. § 1251(a)(2) (emphasis added); *see also* 33 U.S.C. §§ 1312(a), 1314(a)(2). It would be anomalous to conclude that the living shellfish sought to be *protected* under the Act are, at the same time, "pollutants," the discharge of which may be *proscribed* by the Act. Such a holding would contravene clear congressional intent, give unintended effect to the ambiguous language of the Act and undermine the integrity of its prohibitions.

This conclusion is strengthened by further analysis. When faced with an ambiguous statutory term, we may apply other tools of reason in assessing what Congress proscribed. Interpreting the ambiguous term, "biological materials," in its context, we consider that the addition of this material to the waters, so far as the record shows, does not add any identifiable harm, let alone appreciable or significant damage, to the Puget Sound environment. Moreover, there may be countervailing environmental benefits for encouraging shellfish farming in Puget Sound. We are persuaded that Congress did not intend that living shellfish and the natural chemicals and particulate biological matter emitted from them, or the occasional shells that separate from them, be considered pollutants.

By holding that mussel shells and mussel byproduct are not pollutants, we do not suggest that materials found naturally in

the water can never be "biological materials" considered pollutants under the Act. A facility that processes fish on land or sea and that discards skin, scales, bones and entrails into the waters might be discharging pollutants under the Act. Similarly, if shellfish are processed and shells discarded in the water, this might be the discharge of pollutants, even though the biological materials had been in the water before processing. Such materials, although naturally occurring, are altered by a human or industrial process and, as waste material in significant amounts, might affect the biological composition of the water. *See, e.g., Ass'n of Pac. Fisheries v. EPA,* 615 F.2d 794, 802 (9th Cir. 1980) (pollutants are added where a seafood processor removes fish from a body of water, processes them, and then places the "heads, tails and internal residuals of the processed fish" back in the water). In our case, however, the shells and natural byproduct of living mussels released from Taylor's facilities are the result of the natural biological processes of the mussels, not the waste product of a transforming human process.[9] Accordingly, we do not view Taylor's mussel shells and mussel byproduct as pollutants under the Clean Water Act.

That "biological materials" means the waste product of a human or industrial process is in accord with the views of other courts that have examined what constitutes "biological materials" under the Act. *See Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114, 117 (2d Cir.1994) (liquid manure spread on farm fields met definition of pollutant as it was "solid waste, ... sewage, ... biological materials, ... and agricultural waste discharged into water") (internal quotation marks and citation omitted); *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 645 (2d Cir.1993) (glass vials of human blood placed into river were "biological materials"); *National Wildlife Fed'n v. Consumers Power Co.,* 862 F.2d 580, 583 (6th Cir.1988) ("live fish, dead fish and fish remains" discharged into Lake Michigan after live fish were pulled through dam's turbines "are pollutants within the meaning of the CWA, since they are biological materials"); *United States v. Frezzo Bros.,* 461 F.Supp. 266, 269–70 (E.D.Pa. 1978), *aff'd,* 602 F.2d 1123 (3d Cir.1979) (runoff from pile of "mushroom compost" was discharge of "sewage" and "biological materials"). These cases support that the "biological materials" that are "pollutants" under the Act are materials that are transformed by human activity. We reject a broader interpretation in this case. Moreover, our conclusion that the statutory term "biological materials" means the waste product of a human process is further reinforced by the Act's use of the term "pollution," which is defined as the "*man-made* or *man-induced* alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19) (emphasis added).

We conclude that Taylor's mussel shells and the byproduct from these living mussels are not "biological materials" under the Act because these materials come from

---

9. As a caveat, the record does not indicate that the biological materials released by Taylor's facilities were released in concentrations significantly greater than would otherwise be found in the waters of the Puget Sound. Accordingly, we need not decide whether the addition of biological materials to the water in concentrations significantly higher than natural concentrations could support a conclusion that such biological materials are "pollutant[s]" under the Act by virtue of their high concentrations. In this case, feces and chemicals exuded from live mussels have not been shown in the record significantly to alter the character of Puget Sound waters, and the record suggests instead that the mussel-harvesting operations generally purify the waters.

the natural growth and development of the mussels and not from a transformative human process. We hold that the mussel shells, mussel feces and other mussel by-product released from Taylor's live mussels thus do not fall within the statutory definition and meaning of "pollutant."[10]

## V

 As an alternative and related basis for decision, we next address whether Taylor's mussel facility is a "point source," an issue keenly disputed in this litigation and the amicus briefing before us. The Clean Water Act's definition of a "point source" provides that a "point source" is

*any discernible, confined and discrete conveyance,* including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14) (emphasis added). The EPA has determined that a fish farm that harvests aquatic animals can be a point source under the Clean Water Act. 40 C.F.R. § 122.24(a). Under EPA regulations, a "concentrated aquatic animal production facility," or "CAAPF," is a point source and subject to the NPDES permit requirements if it contains, grows or holds, among other things, "[c]old water fish species or other cold water aquatic animals in ponds, raceways, or other similar structures which discharge at least 30 days per year." 40 C.F.R. Pt. 122, App. C(a). Taylor's facilities meet these crite-

ria. However, the EPA *excludes* from classification as a CAAPF: "(1) Facilities which produce less than [approximately 20,000] pounds of aquatic animals per year; *and* (2) Facilities which feed less than [approximately 5,000 pounds] of food during the calendar month of maximum feeding." *Id.* (emphasis added).[11] Because Taylor does not add any feed to its rafts or to the surrounding water, its facilities fall under the second exception to CAAPF classification.

APHETI argues that, even if Taylor's mussel harvesting facilities do not meet the EPA's definition of a CAAPF, they still fall under the general definition, "discernible, confined, and discrete conveyance," or under the more specific definition, "vessel or other floating craft." By this reasoning, APHETI argues that Taylor's mussel rafts are "point source[s]" and that their operation, if discharging pollutants, requires an NPDES permit. But, whatever merit this argument might have in the absence of a regulatory definition of when an aquatic animal feeding operation is a point source, the argument has little persuasive effect when faced with aquatic animal farming that does not involve feeding and that is not within the express and described limits that invoke the Act under the regulation.

We have previously held that " 'in the construction of administrative regulations . . . it is presumed that every phrase serves a legitimate purpose and, therefore, constructions which render regulatory provisions superfluous are to be avoided.' "

---

10. Because we hold that the mussels and mussel byproduct in this case are not pollutants, we need not consider whether the release of such materials from the rafts is a "discharge" under the Act.

11. Even if an aquatic animal production facility does not meet the CAAPF production and feed criteria, the EPA or authorized state

agency has the discretion, on a case-by-case basis, to "designate any . . . cold water aquatic animal production facility as a concentrated aquatic animal production facility upon determining that it is a significant contributor of pollution to waters of the United States." If so designated, such a facility would require an NPDES permit to operate. 40 C.F.R. § 122.24(c).

*Rainsong Co. v. Fed. Energy Regulatory Comm'n,* 151 F.3d 1231, 1234 (9th Cir. 1998) (quoting *Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir.1976)). In the context of aquatic animal harvesting, the EPA's regulations expressly exclude from the definition of "point source" facilities, like Taylor's, that do not meet certain feeding thresholds. To hold that these facilities are nonetheless "point sources" under the statutory definition would render the EPA's CAAPF criteria superfluous and undermine the agency's interpretation of the Clean Water Act. *See Natural Res. Def. Council, Inc. v. Costle,* 568 F.2d 1369, 1382 (D.C.Cir.1977) (EPA was given the power under the Act to define point sources). Placing greatest weight on the regulations that are most directly related to the conduct under challenge, we hold that Taylor's facilities are not "point sources" under the Act.

### VI

APHETI, on behalf of its members, has a right of citizen suit to challenge Taylor's operation under the Clean Water Act, regardless of how Ecology views the rafts' production of mussels. But when we consider these mussel growing rafts and their operations in Puget Sound in light of the text and history of the Clean Water Act, we conclude that mussel byproduct and mussel shells that enter Puget Sound from the living creatures suspended on ropes attached to Taylor's rafts are not "pollutants," Taylor's rafts are not "point sources," and Taylor's mussel harvesting on these rafts without a permit does not offend the Clean Water Act.

**AFFIRMED.**